Mark D. Lammers
State Bar No. 010335
**RUSING LOPEZ & LIZARDI, P.L.L.C.**
6363 North Swan Road, Suite 151
Tucson, AZ 85718
Telephone: (520) 792-4800
Facsimile: (520) 529-4262
Email: mdlammers@rllaz.com

*Counsel for Plaintiff*

[*Additional Counsel on Signature Page*]

# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Ian Mednick, Derivatively on Behalf of Leslie's, Inc., | Case No: |
| Plaintiff, | |
| v. | **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |
| Michael R. Egeck, Steven L. Ortega, Yolanda Daniel, Eric Kufel, Susan O'Farrell, Claire Spofford, John Strain, Jodeen A. Kozlak, Marc Magliacano, James R. Ray, Jr., and Steven M. Weddell, | |
| Defendants, | **JURY TRIAL DEMANDED** |
| and, | |
| Leslie's, Inc., | |
| Nominal Defendant. | |

Plaintiff Ian Mednick ("Plaintiff"), by and through his undersigned counsel, derivatively on behalf of Leslie's, Inc. ("Leslie's" or the "Company"), submits this Verified Shareholder Derivative Complaint (the "Complaint"). Plaintiff's allegations are based upon his personal knowledge as to himself and his own acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including a review of publicly available information, including filings by the Company with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, Company documents obtained through a books and records demand made pursuant to 8 *Del. C.* § 220, and matters of public record.

## **NATURE OF THE ACTION**

1.      This is a shareholder derivative action brought in the right, and for the benefit, of the Company against certain of its officers and directors seeking to remedy Defendants' violations of state and federal law that have occurred from February 3, 2022 through the present (the "Relevant Period") and have caused substantial harm to the Company.

2.      Leslie's is the largest direct-to-consumer brand in the pool and spa care industry, serving residential and professional consumers.

3.      Throughout the Relevant Period, Defendants caused the Company to mislead the market and investors about demand for the Company's products and the status of its inventory, particularly in chlorine-based pool treatments. During the Relevant Period, the Company's inventory of chlorine-based products exceeded the amount needed by customers. The Company distribution centers had reached capacity, forcing the Company to send retail stores more inventory than they could store safely. Despite the fact that improper storage of chlorine-based products creates serious fire hazards, retail locations had no choice but to store excess product in parking lots and closets, and managers had to shift inventory around to deal with the overflow and associated dangers. As the situation became

unworkable, Defendants were forced to enlist third party chemical storage companies to handle the excess inventory.

4.      To rid the Company of this growing excess inventory, Defendants began to off-load chlorine-based products on its customers.  In late 2021, Defendants began sending letters to customers, reporting that the Company "couldn't guarantee product availability in the second half" of 2022 and "encourag[ing] them to purchase [chlorine-based products] early prior to the pool season," which belied their repeated public assertions that they were "happy with [their] current supply" and that the Company had an "always-on procurement strategy."  However, Defendants knew their off-loading of chlorine-based products resulted in customers holding excess "garage and shed inventory."  This pushed demand down for the Company's products and slashed its sales and gross margin results, eventually leading to the Company's earnings collapsing in Q3 2023.

5.      During the Relevant Period, Defendants concealed from investors that the Company and its customers had a glut of inventory, which would inevitably depress future demand.  Instead, Defendants publicly touted "durable" and "strong consumer demand" for Leslie's products, and assured investors that they were "strategically invest[ing] in inventory to meet heightened consumer demand." And that they "haven't seen any indication of any meaningful pull-forward" of customer purchases.

6.      As the Company's reported quarterly inventory balances continued to rise, Defendants assured investors that the Company's inventory position was "appropriate" and that they would "strategically manage inventory levels" as necessary. In response to analyst questions about the Company's inventory, particularly at the beginning of 2023 in the wake of lower sales, Defendants again reassured the market that it was just an "outsized weather impact" and a "timing shift" that caused the reduction in demand.  However, this story could not excuse the decline in sales and gross margins which the Company experienced during its first quarter of peak pool season in 2023 (*i.e.*, Q3 2023).  Defendants were then forced to

admit that "consumers entered the pool season with a greater than normal amount of chemicals left []over from last year."  The Company's inventory levels deeply impacted earnings results, as "gross margins were down year-over-year due to higher product costs that we could not pass through to consumers, the impact of higher distribution-related expenses and capitalized costs as we reduce inventory from peak levels, and fixed cost deleverage."

7.     Defendants knew or were reckless in not knowing that their statements were misleading when made. The fraud involved the Company's non-discretionary core product offerings, and specifically chemical products that made up over 45% of its sales. Further, Defendants Egeck and Weddell, who held the top two executive positions at the Company – CEO and CFO – repeatedly claimed on conference calls with investors their granular-level knowledge of: (a) industry factors affecting chlorine supply; (b) the Company's inventory levels and strategies for inventory management and procurement; (c) the predictable "annuity-like" nature of the pool and spa industry; and (d) consumer demand through the Company's close tracking of customer purchases.

8.     The relevant truth concealed by Defendants' misrepresentations and omissions was revealed to the market on July 13, 2023, when the Company announced a 9% year over year sales decline and 18% drop in gross profits.  On this news, the Company's share price fell nearly 30%, from a closing price of $9.52 per share on July 13, 2023, to a closing price of $6.70 per share on July 14, 2023, and fell another 18% the following trading day to close at $5.46 per share.

## JURISDICTION

9.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 as the claims asserted herein arise under Section 10(b) of the Securities Exchange Act of 1934. This Court also has jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

10. This Court has personal jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the courts of this District permissible under traditional notions of fair play and substantial justice.

11. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because: (i) the Company maintains its principal place of business in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including Defendants' primary participation in the wrongful acts detailed herein and aiding and abetting and conspiracy in violation of fiduciary duties owed to the Company, occurred in this District; and (iv) Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

12. In connection with the acts, transactions, and conduct alleged herein, the Individual Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## **THE PARTIES**

**Plaintiff**

13. Plaintiff is, and was at relevant times, a shareholder of the Company. Plaintiff will fairly and adequately represent the interests of the shareholders in enforcing the rights of the corporation.

**Nominal Defendant**

14. ***Nominal Defendant Leslie's*** is incorporated under the laws of Delaware with its principal executive offices located in Arizona.

**Director Defendants**

- 4 -

15.     **Defendant Michael R. Egeck** ("Egeck") is the Company's Chief Executive Officer ("CEO") and has served as a company director since 2020.  He has served as the CEO since February 2020.  For each of the 2021, 2022, and 2023 fiscal years, Defendant Egeck's base salary was $1,025,000. In connection with the Company's Initial Public Offering ("IPO"), Defendant Egeck was granted 2,535,064 restricted stock units ("RSUs") and 1,176,472 stock options – including performance-vesting stock options eligible to vest 50% on the Company's achievement of the adjusted net income target for fiscal year 2021 and 50% on the Company's achievement of the adjusted net income target for fiscal year 2022.  He received proceeds of $19,221,045 from his sales of stock in the Company's secondary offering on February 16, 2021, and proceeds of $13,507,468 from his sales of stock in connection with the June 14, 2021 secondary offering.  Defendant Egeck was also eligible to receive performance-based bonus compensation each year pursuant to the Company's achievement of EBITDA thresholds and target amounts, targeted at 100% of his base salary.  Defendant Egeck's annual cash bonus earned was $1,534,512 for fiscal 2021 and $761,575 for 2022 but fell to zero for 2023.

16.     **Defendant Steven L. Ortega** ("Ortega") served as Chairman of the Board of Directors (the "Board") from 2020 until March 2024 and previously served as CEO and President of the Company from 2017 to 2020, President and Chief Operating Officer from 2015 to 2017, Chief Financial Officer ("CFO") and Chief Operating Officer ("COO") from 2014 to 2015, and EVP and Chief Financial Officer from 2005 to 2015.

17.     **Defendant Yolanda Daniel** ("Daniel") has served as a Company director since 2020.

18.     **Defendant Eric Kufel** ("Kufel") has served as a Company director since 2018 and served as Executive Chairman from January 2019 through September 2019.

19.     **Defendant Susan O'Farrell** ("O'Farrell") has served as a Company director since 2020.

20.     ***Defendant Claire Spofford*** ("Spofford") has served as a Company director since 2022.

21.     ***Defendant John Strain*** ("Strain") has served as a Company director since 2018.

22.     ***Defendant Jodeen A. Kozlak*** ("Kozlak") served as a Company director from October 2020 to March 2023.

23.     ***Defendant Marc Magliacano*** ("Magliacano") served as a Company director from February 2017 to March 2023.

24.     ***Defendant James R. Ray, Jr.*** ("Ray") served as a Company director from August 2021 to December 2023.

25.     The above-named defendants are collectively referred to herein as the "Director Defendants."

**Officer Defendants**

26.     ***Defendant Steven M. Weddell*** ("Weddell") was, at all relevant times, the Company's CFO and Executive Vice President.  On July 13, 2023, together with its release of a revised fiscal 2023 outlook, Leslie's announced that Weddell would step down from his position as CFO effective August 7, 2023, and would serve as a Special Advisor to the Company until December 31, 2023.  For each of the 2021, 2022, and 2023 fiscal years, Defendant Weddell's base salary was $570,000.  In connection with the Company's IPO, Defendant Weddell was granted 234,587 RSUs and 735,295 stock options – including performance-vesting stock options eligible to vest 50% on the Company's achievement of the adjusted net income target for fiscal year 2021 and 50% on the Company's achievement of the adjusted net income target for fiscal year 2022.  He received proceeds of $13,621,171 from his sales of stock in the Company's secondary offering on February 16, 2021, and proceeds of $12,458,232 from his sales of stock in connection with the June 14, 2021 secondary offering.     Defendant Weddell also received performance-based bonus

compensation each year pursuant to the Company's achievement of EBITDA thresholds and target amounts, targeted at 100% of his base salary. Defendant Weddell's annual cash bonus earned was $840,165 for fiscal 2021 and $423,510 for 2022 but, like Defendant Egeck, fell to zero for 2023.

27.    Defendants Egeck and Weddell are collectively referred to herein as the "Officer Defendants."

28.    The Director Defendants along with the Officer Defendants are collectively referred to herein as the "Individual Defendants" or "Defendants."

## SUBSTANTIVE ALLEGATIONS

**Background**

29.    Founded in 1963, Leslie's is the world's largest retailer of swimming pool and spa supplies, services, and repairs.  The Company serves commercial, residential, and professional customers, and more than 80% of its product assortment comprises nondiscretionary items, including chemicals and equipment necessary for proper maintenance of pools and spas.  Heading into 2020, the Company's promotional material touted that it had over 55 years of consecutive growth because of its "highly predictable, recurring revenue model."

30.    In February 2020, Defendant Egeck was hired to be the Company's CEO. Shortly afterwards, the COVID-19 pandemic hit the United States. The pandemic and society's turn to at home activities raised the level on the Company's predictable growth. New pool permit activity grew 32% through July 2020 compared to the same period in 2019. The industry forecast similar growth in pool installations through 2020 and 2021.

31.    In the wake of this pool-building boom, on October 29, 2020, the Company conducted its IPO, listing its stock on the Nasdaq under the symbol "LESL."  Forty million shares of stock were sold in the offering at $17.00 per share. The proceeds of the offering

were intended to be used to pay $390 million in previously issued debt and pay down the Company's term loan, which had $815.3 million outstanding as of June 2020.

32.    In the offering documents, which were signed by Defendants Egeck and Weddell, the Company stressed that each new pool and spa installation represented a predictable, "annuity-like stream of chemical, equipment, and service revenue" and stated, "[g]iven we play primarily in the aftermarket business, we have a highly predictable, recurring revenue model, which is evidenced by our 57 years of sales growth."   The Company also identified that "[m]ore than 80% of our product sales are non-discretionary and recurring in nature" and "80% of our chemical sales are derived from proprietary brands and custom formulated products, which allow us to create an entrenched consumer relationship [and] control our supply chain[s]."

33.    The offering documents also identified the Company's "consumer-centric integrated ecosystem" and stated that "[o]ver the last two years, we have invested in new capabilities, including global inventory visibility."   In addition, in 2014, the Company launched a loyalty membership program which, as of 2020, served more than 3.2 million customers who represented more than 70% of the Company's total sales.   As a result, Defendants stated in the offering documents, "[w]e track consumer preferences, order frequency, and pool profiles in order to curate and enhance our recommendations and promotions, anticipate product demand, and track lifetime value to better incentivize our loyalty members."

34.    In the late summer of 2020, a fire shut down the Louisiana manufacturing facility of the nation's second-largest maker of dry chlorine products, BioLab. Approximately 40% of the country's chlorine tablet supply was destroyed.   Combined with the pandemic's impact on available labor and constraints on the global supply chain, the fire resulted in significant shortages in Trichlor – a chlorine-based chemical product used for

pool maintenance.  As a result of tightening supply, the market price for chlorine-based products, including Trichlor, skyrocketed.

35.    The Company leveraged its relationships with suppliers to maintain strong Trichlor inventory levels in 2020 and into 2021.  On February 4, 2021, during the Company's Q1 2021 earnings conference call, Defendant Egeck highlighted that "[d]espite widespread industry [chlorine] shortages, we are confident in our ability to both serve our existing consumers as well as a significant number of new consumers we are acquiring with our growth strategies."  Defendant Egeck continued "[w]e have a 30-year relationship and a history of superior performance with our primary supplier, and we have a contract in place that secures both volume and cost through 2025."  Later on the call, after stating that the Company "will have supply of products that other retailers don't," Defendant Egeck emphasized that this benefit

> allows us to capture a sale, but more importantly, it's allowing us to capture new customers.  And with the emphasis we put on consumer file growth, keeping customers with our loyalty program, wrapping our arms around them once we've got them in our system, we see this, this industry shortage situation, not just as us getting immediate sale, but us getting a new customer, which is much more durable.

36.    Defendant Egeck also confirmed that the Company's supply chain would remain resilient through the pandemic issues: "We're constantly managing our supply chain, both for efficiency and quantity. So we're certainly not just sitting here not looking at it closely, but we feel very good of where we're at."

37.    The Company again reiterated its ability to manage its supply chain on the May 5, 2021 second quarter earnings call, with Defendant Egeck stating: "[W]e remain confident in our supply chain and in our ability to serve both our existing consumers as well as the new consumers we are acquiring with our growth initiatives."

38.     Thus, the chlorine shortage and price increases served as a windfall for the Company, which has traditionally been able to pass its inflationary costs on to its customers. Defendants assured investors that the shortage was a growth opportunity for the Company. As Defendant Weddell described:

> We're seeing, based on some of the recent news around [chlorine] shortages, that we're attracting a lot of first-time consumers to Leslie's and getting introduced to the experience and what we have to offer.  So the durability of the opportunity for us is really wrapping our arms around those consumers and showing them more than just the supply of chlorine in the current season.

39.     Because of its ability to take advantage of the chlorine shortage impacting other pool supply companies, the Company's stock price increased significantly.  By the end of January 2021, the stock price had increased from the $17.00 per share IPO price to over $28.00 per share.  By June of 2021, the stock was trading above $29.75 per share.

40.     Taking advantage of the Company's ability to maintain a steady flow of chlorine based products and other inventory and the accompanying increased Company revenue and stock price, Defendants conducted secondary offerings of the Company's stock in February, June, and September 2021.  During the February 16, 2021 offering, 33,350,000 shares of stock were sold by Company insiders and investors at a price of $26.00 per share. Defendants Egeck and Weddell sold $19.2 million and $13.6 million of their stock, respectively, and the Executive Chairman of the Company, Michael Ortega ("Ortega"), sold another $20.8 million in stock.  During the June 14, 2021 offering, investors and insiders sold another 24,500,000 shares of stock at a price of $27.64 per share. Once again, Defendants Egeck, Weddell, and Ortega sold millions of dollars of their stock: $13.5 million, $12.5 million, and $20.0 million, respectively.  During the September 17, 2021 offering, investors and insiders sold another 15,820,000 shares of stock at a price of $22.00 per share. The Company did not receive proceeds from any of these offerings.

41.     In the offering documents for the 2021 offerings, Defendants continued to assure investors about the predictable, "annuity-like" nature of the Company's business and

their ability to track and predict product demand. That included emphasizing that "[g]iven we play primarily in the aftermarket business, we have a highly predictable, recurring revenue model" and "[w]e track consumer preferences, order frequency, and pool profiles in order to curate and enhance our recommendations and promotions, anticipate product demand, and track lifetime value to better incentivize our loyalty members."

42.    But as 2021 was coming to a close, Defendants' prior ability to take advantage of the chlorine supply chain problems turned into a liability. The chlorine supply chain stabilized just as Leslie's was increasing inventory in Trichlor and other products in the hope that shortages would persist through 2022 and 2023.  Moreover, in an effort to effectively corner the market on chlorine treatment products, Defendants made purchase commitments in 2022 and into 2023 that added to Leslie's already huge inventory.  By the end of Q1 2022 (January 1, 2022),[1] Leslie's reported total inventory of $245,000,000, an increase of 40% ($70,000,000) from Q1 2021 and more than 23% ($46,000,000) from just October 2021. Throughout 2022, including during the key summer pool season when inventory levels historically decreased, the Company reported inventory continued to increase, from $345,000,000 at the end of Q2 2022, to $361,000,000 at the end of Q3 2022, to $362,000,000 at the end of Q4 2022. By the end of Q1 2023, December 31, 2022, reported inventory was $430,000,000, more than 75% higher than the Company's inventory at the end of Q1 2022.

43.    Former Company employees confirm that the Company found itself with excess supplies of Trichlor and chemical treatment products just as the supply of chlorine was normalizing at the start of 2022 and that the inventory problems at the Company only got worse during 2022 and into 2023. In an effort to dump excess inventory, starting in late 2021, Defendants had letters sent to the Company's loyalty program members – customers who represented more than 70% of the Company's total sales.  Despite Defendants'

---

[1]    The Company's fiscal year ends on the Saturday closest to September 30th, thus the fiscal years for 2022 and 2021 ended on October 1, 2022 and October 2, 2021, respectively.

statements to investors about the strength of the Company's supply chain and the "contract[s] in place that secures both volume and cost through 2025" for chlorine-based products, as well as the Company's burgeoning inventory levels and the end of the chlorine shortage, the letters urged customers to "purchase early prior to the pool season" and stock up on treatment products because "we [can't] guarantee product availability" later in the year. The letters and a campaign to have Company stores push customers to buy more treatment products than were needed succeeded in boosting sales going into 2022, but at the cost of future sales.  As Defendants knew, the product customers were sitting on at the end of 2022 – what became known as "garage and shed inventory" – would directly reduce the volume of treatment product that would be purchased for the 2023 season.

44.    Former Company employees also confirm that, despite the efforts to unload excess inventory onto loyalty customers, the Company continued to pile up excess inventory of chemical pool treatment products.  A former Leslie's allocations and planning analyst who was with the company from 2021 through early 2023 and had responsibility for overseeing the moving of inventory from Leslie's distribution centers to the Company's retail stores, confirmed that, by 2022, the Company's distribution centers had far too much inventory, which was being offloaded and pushed into stores even though the stores did not have the physical space to store the chemical inventory.[2] The situation got so bad in 2022 that the Company's stores were refusing to accept shipments of chlorine-based products and other pool supplies and were trying to send inventory back to the Company's distribution centers. The former allocations and planning analyst said that, by late 2022, it was internally recognized that the Company's financial projections for 2023 were unachievable given that there was too much inventory in the distribution centers.

---

[2]    All references to former employees is found and taken from the securities class action entitled *Treasurer of the State of North Carolina v. Leslie's Inc., et al.,* No. CV-23-1887-PHX-SMB (D. Az.) (the "Securities Class Action").

45.     As a result of the Company's management pushing excess inventory out to stores, chemical treatment products, including Trichlor, were being stored in closet space and outside at the stores in parking lots.  Regional managers were forced to shift inventory from one store to another because the stores were overflowing with chlorine-based products and had nowhere safe to put it.  Upon information and belief, one general manager recounted that, beginning in 2022, their store was receiving so much unplanned chemical inventory from the Company's distribution centers that there was nowhere to store it all and still adhere to safety and fire codes. Yet, unlike in the past, there was no way for them to stop the shipments from coming to stores. Indeed, upon information and belief, a former inventory planner who was with the Company through late 2023 said that, as a result of the Company's excess inventory, management's goal was to send more inventory out to stores than was actually needed.

46.     Upon information and belief, according to a district manager who was with the Company from before the IPO to late 2022, the Company maintained records of customers' purchasing histories and knew whether they were sitting on excess supplies of products.  Prior to the Relevant Period, at the height of the chlorine shortage, the Company used this information to discourage customers from purchasing too much Trichlor and related products.  But, as described above, by 2022, the Company's management was pushing stores to sell excess amounts of chemical products, and it was clear the Company was overselling pool treatment products, undercutting future sales. Nevertheless, this district manager confirmed, the Company's inventory kept growing in 2022, resulting in the stores in his district being overstocked with chemical products to the point that they were in violation of fire codes and regulations regarding the storage of chemical products.

47.     In 2022 and 2023, as the Company's distribution centers and stores became so overloaded with chemical treatment product inventory, Defendants were forced to retain the services of third-party chemical logistics and storage companies. As Defendants later

admitted in November 2023, the Company's excess chemical product inventory "required us to use several third-party off-site storage facilities with a lot of movement of product between those facilities," incurring millions of dollars in incremental inventory adjustment costs.

## THE MISLEADING STATEMENTS AND MATERIAL OMISSIONS

**Q1 2022 Earnings Report**

48.     On February 3, 2022, the Company issued a press release containing the Company's financial results for Q1 2022.  The press release reported that, compared to the prior year period, sales increased 27.5% to $184.8 million, with comparable sales growth of 20.5%, and gross profit increased 30.2% to $67.3 million, with gross margins increasing 70 basis points.  Adjusted EBITDA improved by $1.3 million to $1.1 million compared to a slight loss in the prior year period. On these positive results, the Company raised its guidance for fiscal 2022, increasing the outlook for sales by $20 million, gross profit by $10 million, and adjusted EBITDA by $5 million.

49.     Defendant Egeck was quoted in the press release, stating that "*the competitive advantages derived from our integrated platform of physical and digital assets, and strong execution of our strategic growth initiatives drove record first quarter results.*"

50.     On February 3, 2022, the Company also held a conference call with analysts and investors, led by Defendants Egeck and Weddell, to discuss the Company's Q1 2022 results.  On the conference call, Defendant Egeck emphasized that consumer demand for the Company's products remained strong and the Company was "*benefiting from strong secular macro trends that are driving durable consumer demand and are showing no signs of slowing.*"

51.     On the conference call, Defendant Weddell reported that, while inventory conditions in the industry, particularly for chemicals and equipment, remained constrained, the Company's end-of-quarter inventory was up 40% to $245 million compared to $175

million at the end of the prior year quarter.  Defendant Weddell gave investors assurance that they had "*an always-on procurement strategy at Leslie's. Our team continues to proactively work with our vendor partners to manage the flow of inventory, and we continue to identify opportunities to strategically invest in inventory to meet heightened consumer demand and prepare for pool season.*"

52.     On February 4, 2022, the Company filed its Form 10-Q for the quarter ended January 1, 2022 with the SEC, signed by Defendant Weddell and attaching Sarbanes-Oxley Act certifications signed by Defendants Egeck and Weddell, reporting the Company's Q1 2022 results.  The Q1 2022 Form 10-Q stated: "There have been no material changes from the risk factors disclosed in our Annual Report on Form 10-K for the year ended October 2, 2021," filed on December 10, 2021 ("FY 2021 Form 10-K").  The Company's FY 2021 Form 10-K contained the following purported risk disclosure that was incorporated by reference in the Company's Q1 2022 Form 10-Q, as well as the Company's Forms 10-Q filed on May 6, 2022 (Q2 2022) and August 5, 2022 (Q3 2022):[3]

> ***We may not be able to successfully manage our inventory to match consumer demand, which could have a material adverse effect on our business, financial condition, and results of operations.***
>
> ***We base our inventory purchases, in part, on our sales forecasts.  If our sales forecasts overestimate consumer demand, we may experience higher inventory levels, which could result in the need to sell products at lower than anticipated prices, leading to decreased profit margins.*** Conversely, if our sales forecasts underestimate consumer demand, we may have insufficient inventory to meet demand, leading to lost sales, either of which could materially adversely affect our financial performance.  [Emphasis added].

**Q2 2022 Earnings Report**

---

[3]     The Company's May 6, 2022 and August 5, 2022 Form 10-Q filings were also signed by Defendant Weddell and included Sarbanes-Oxley Act certifications signed by Defendants Egeck and Weddell.

53.     On May 5, 2022, the Company issued a press release containing the Company's financial results for the second quarter ended April 2, 2022. The press release reported that, compared to the prior year period, sales increased 18.5% to $228.1 million, with comparable sales growth of 13.3%, and gross profit increased 19.5% to $85.6 million, with gross margins increasing 30 basis points. Adjusted EBITDA for the quarter was $8.7 million compared to $9.5 million in the prior year period.  With this announcement, the Company substantially raised its guidance again for fiscal 2022, increasing its outlook for sales by $85 million, gross profit by $38 million, and adjusted EBITDA by $18 million.

54.     The press release quoted Defendant Egeck stating that "non-discretionary, recurring nature of after-market pool industry demand, our team's strong execution against our strategic growth initiatives, and an advantaged inventory position were all key drivers of our performance," and that the Company's was entering the 2022 pool season "ready to meet the needs of our customers."

55.     On May 5, 2022, the Company also held a conference call with analysts and investors, led by Defendants Egeck and Weddell, to discuss the Company's Q2 2022 results. On the conference call, Defendant Egeck reported that the industry was still facing constrained supply conditions, stating "[w]ith regard to chlorine tabs, supply remains constrained," and "domestic Trichlor capacity is tight and falling short of elevated consumer demand." But with respect to the Company, Defendant Egeck stated:

> I'm going to say we're happy with our current supply, though the flow of it could be a little more front loaded, still pleased with the supply. We're in line to buy even more next year, need to feed the machine we've created for chemical consumption and the [Company's] growing consumer profile.

56.     On the conference call, Defendant Weddell repeated that the Company "continue[d] to expect inventory conditions in the industry to remain tight throughout fiscal 2022, particularly for chemical," and that the Company ended the quarter with inventory of $345 million, up 24% compared to $278 million at the end of the prior year same quarter.

Also, Defendant Weddell told investors that the Company "continues to proactively work with our vendor partners to manage the flow of inventory and we continue to identify opportunities to strategically invest in inventory to meet heightened consumer demand and prepare for pool season."

57.    During the conference call, analysts asked Defendants Egeck and Weddell about customer purchasing behavior, specifically if the Company was seeing its customers making non-discretionary purchases earlier than usual ("pull-forward" purchases):

[**William Blair & Co. L.L.C.**:] So have you tried to calculate a potential pull forward estimate or is this just not your view because of the macro drivers and share gain in price?

[**Defendan**t **Egeck**:] […] I would say it's not our view, both for the reasons you stated. And also, due to the fact that we track [sales] very carefully. We're able to see by consumer what they purchased prior years versus what they've purchased year-to-date.  It's one of the things that we try to pay a lot of attention to.  And we just haven't seen any indication of any meaningful pull-forward.

* * *

[**Defendant Egeck**:] I started with the first question saying we don't see any evidence of any significant pull-forward.  And in fact, with [unit per transaction], I think we're seeing kind of just the opposite people buying more items but perhaps smaller quantities.

58.    In response to another analyst question to Defendants Egeck and Weddell concerning whether they were seeing any customer "trade down or pull back" in purchases, Defendant Egeck responded "I think what you're seeing in our business is nondiscretionary nature of the vast majority of it and recurring demand […].  [A]nd in the core businesses of chemicals and equipment and parts and repair and maintenance, we have not seen any indication of a decrease in demand."

**June 6 and 7, 2022 Analyst Conference Calls**

- 17 -

59.     On June 6, 2022, Defendant Weddell spoke at an analyst conference call hosted by Robert W. Baird.  During the conference call, Defendant Weddell responded to a question about Leslie's inventory given the flow of business:

> [**Analyst**:] And I guess the other question would just be maybe on inventory. So I mean, inventory has been a popular topic in retail for the last couple of weeks. How does inventory look for you guys? How do you feel about that given the flow of business?

> [**Defendant Weddell**:] Sure. Yes. We took a strategic – we've made a strategic decision last year to heavily invest in inventory. If you remember, most of the inventory that we have is nondiscretionary. It's not something fashion risk or obsolescence. If you look at the end of Q2, our fiscal Q2, effectively at the end of March, up $70 million or up 25%. So we worked very hard and closely with our vendors to procure effectively as much inventory as we can to meet the heightened demand that we see today, and it's a competitive advantage.

> So I feel very good with our inventory position today.

60.     The next day, on June 7, 2022, Defendant Weddell spoke at an analyst conference call hosted by William Blair.  During the conference call, Defendant Weddell was again asked about the Company's inventory and whether the Company had all it needed. He responded: "I think at this point, we wish we had more. So we believe this year, we will still not have all the inventory that we need to meet all the demand that's out there, but certainly feel better about the inventory position today than in prior years."

**Q3 2022 Earnings Report**

61.     On August 5, 2022, the Company issued a press release containing the Company's financial results for the third quarter ended July 2, 2022.  The press release reported that financial performance in the quarter was adversely impacted by "execution issues" at the Company's New Jersey distribution center.  The press release also highlighted that, even with the logistical problems, sales increased 12.9% to $673.6 million, compared to the prior year period, with a comparable sales increase of 7.4%.  Although gross profit

increased 7% to $303.6 million during the quarter, gross margins decreased by 250 basis points, "primarily due to shifts in business mix, decreased product margin and higher distribution expenses." Additionally, adjusted EBITDA increased 2% compared to the prior year period to $182.9 million. The operational setback caused the Company to reduce its guidance for fiscal 2022, lowering the sales outlook to $1,550 to $1,570 million (from $1,575 to $1,610 million), the gross profit outlook to $655 to $670 million (from $700 to $715 million), and the adjusted EBITDA outlook to $287 to $297 million (from $315 to $330 million).

62.    On August 5, 2022, the Company also held a conference call with analysts and investors, led by Defendants Egeck and Weddell, to discuss its Q3 2022 results. During the conference call, Defendant Weddell confirmed that "demand for [Leslie's] core nondiscretionary product remains solid," and Egeck reiterated that "demand, we think, is very much alive and stable."

63.    During the conference call, Defendant Weddell also spoke about the Company's inventory. Defendant Weddell reported that the Company ended the quarter with $361 million in inventory, up 61% from $224 at the end of Q3 2022. Defendant Weddell stated: "[W]e view our current inventory position as appropriate given the uncertainty of supply for the balance of the year and into fiscal 2023."

64.    During the conference call, analysts asked about the Company's inventory levels and what investors could expect at the end of the 2022 pool season (Q4 2022). Defendant Weddell responded that the Company expected inventory to remain elevated, but stated "we're in a much better position from a Trichlor perspective across our network, both -- all stages, raw materials, produced goods, in our DCs and in our stores." Defendant Weddell further added that:

> [I]f the choice is to take inventory at a little bit higher level today, going into the end of the year and to start off next year in a better position versus try to run leaner. We will take the former in the current environment. So it's

1

2

something we expect to actively manage in the year-end and through next year, don't necessarily view these levels as permanent increases. But in the current environment, it's the appropriate level of inventory.

3

4

65.    Defendant Egeck also noted on the conference call that "Trichlor inventory is in good shape."

5

6

**Q4 2022 and FY 2022 Earnings Report and Investor Day Conference**

7

8

9

10

11

12

13

14

66.    On November 30, 2022, the Company issued a press release containing the Company's financial results for the fourth quarter and fiscal year ended October 1, 2022. The press release reported that, compared to fiscal 2021, sales for the year had increased 16.3% to $1,562.1 million, with a comparable sales growth of 10.6%, while gross profit also increased 13.2% to $673.7 million, with a gross margin of 43.1%.  Additionally, adjusted EBITDA increased 8% compared to the prior year period to $292.3 million. The Company also offered its first guidance for fiscal 2023 in the press release, projecting the outlook for sales to be between $1,560 to $1,640 million, and gross profit to be between $667 to $708 million, and adjusted EBITDA to be between $280 and $310 million.

15

16

67.    Defendant Egeck was quoted in the press release, stating:

17

18

19

20

Looking ahead, while we anticipate a challenging macro-economic backdrop for Fiscal 2023, we remain focused on delivering against our long-term objectives supported by the recurring non-discretionary demand of the aftermarket pool industry, the competitive advantages of our integrated network of physical and digital assets and the execution of our strategic growth initiatives.

21

22

23

24

25

26

68.    On November 30, 2022, the Company also held an Investor Day and Q4 2022 earnings call with analysts and investors, led by Defendants Egeck and Weddell, to discuss the Company's Q4 2022 and fiscal year results, as well as the drivers of the Company's fiscal year 2022 performance, fiscal year 2023 guidance, and the Company's growth opportunities.  During Defendant Egeck's prepared comments, he made a point of noting

27

28

that, while the Company was being conservative on its 2023 guidance, Defendants "do not see a scenario where we give back significant portions of the gains over the last 3 years."

69.     During the conference call, Defendant Weddell reported $362 million in inventory at end of fiscal year 2022, an 82% increase compared to $199 million in inventory at the end of fiscal year 2021. Defendant Weddell also told investors that the inventory increase related to nondiscretionary product, stating that "[b]oth, the equipment and chemical product categories, are nondiscretionary in nature and are not subject to technology or fashion risk. We view our current elevated inventory position as appropriate given the uncertainty of supply going into fiscal 2023."

70.     Defendant Weddell added that "when we feel we can adequately meet consumer demand and we see an improvement in supply chains, then we will pursue opportunities to reduce inventory." Later during the conference call, Defendant Weddell reiterated the same, stating:

> And as a reminder, we primarily sold nondiscretionary products. And most of the incremental inventory falls into the chemical and equipment categories that are not subject to technology or fashion risk. When we believe we have sufficient inventory to meet consumer demand through season and after we see supply chains across the industry become more predictable, then we will strategically manage inventory levels down to recoup some of the investments we have made in working capital over the last few years.

71.     On November 30, 2022, the Company also filed its Form 10-K for year ended October 1, 2022 ("FY 2022 Form 10-K") with the SEC reporting the Company's FY 2022 results. The FY 2022 Form 10-K was signed by Defendants Egeck, Weddell, Ortega, Daniel, Kozlak, Kufel, Magliacano, O'Farrell, Ray, Spofford, and Strain. The FY 2022 Form 10-K also included Sarbanes-Oxley Act certifications, signed by Defendants Egeck and Weddell. The FY 2022 Form 10-K identified the following purported risk factor with regard to the Company's business:

1

2

> We may not be able to successfully manage our inventory to match consumer demand, which could have a material adverse effect on our business, financial condition, and results of operations.

3

4

5

6

7

> We base our inventory purchases, in part, on our sales forecasts. If our sales forecasts overestimate consumer demand, we may experience higher inventory levels, which could result in the need to sell products at lower than anticipated prices, leading to decreased profit margins. Conversely, if our sales forecasts underestimate consumer demand, we may have insufficient inventory to meet demand, leading to lost sales, either of which could materially adversely affect our financial performance.

8

**Q1 2023 Earnings Report**

9

10

11

12

13

14

15

16

72.    On February 2, 2023, the Company issued a press release containing the Company's financial results for the first quarter ended December 31, 2022.  The press release reported that, compared to the prior year period, first quarter sales increased 5.6% to $195.1 million but noted that the poor weather in the quarter caused a 4% decrease in comparable sales. For gross profit, the press released noted a 3.0% decrease to $65.3 million compared to the prior year period, and gross margin was 33.5%, down 290 basis points year-over-year. Additionally, adjusted EBITDA decreased to an $11.9 million loss, compared to a $1.1 million gain in the same quarter the prior year.

17

18

19

20

21

22

73.    On February 2, 2023, the Company also held a conference call with analysts and investors, led by Defendants Egeck and Weddell, to discuss the Company's Q1 2023 results.  During the conference call, Defendant Egeck noted in his prepared remarks that the Company saw decreased consumer confidence in the quarter, including consumer demand for Trichlor and Cal-Hypo.  When analysts raised concerns about this topic, Defendant Egeck stated:

23

24

25

> I think the way to think about demand is to keep in mind, it's a very small quarter, right, for the whole industry. And I know we've said that a lot. But again, trying to extrapolate trends from this first quarter, which is: a, small; and b, had a really outsized weather impact, I just think that's tricky.

26

\* \* \*

27

28

- 22 -

[A]gain, super small quarter, upsized weather impact being very careful not to draw any trends for the full year from it. And we didn't see anything despite those 2 factors that would tell us we need to.

74.    During the conference call, Defendant Weddell reported that the Company had $430 million in inventory at the end of the quarter, an increase of 76% compared to $245 million at the end of the prior year quarter. Defendant Weddell told investors that "our first priority is to put the company in a position to meet consumer demand for the season. In furtherance of that objective, we continue to view our current elevated inventory position as appropriate and sensible given the uncertainty of supply." Defendant Weddell added that "[w]hen we believe we have sufficient inventory to meet consumer demand through season, and after we see supply chains across the industry become more predictable, then we will strategically manage inventory levels down."

75.    During the conference call, several analysts raised concerns about Leslie's increased inventory levels. On the call, a William Blair & Co. research analyst asked about inventory:

[**William Blair & Co.**:] Can we start with inventory, Mike? The inventory kind of pops off the page and up a bit sequentially. How much is safety stock? And when do you see inventory normalizing?

[**Defendant Weddell**:] […] [T]here's 2 key reasons that inventory is up, one is sales growth over the last year – last few years. And then importantly, the strategic decision that we made to intentionally pull forward 2023 receipts in advance of season.

[…] So the pull forward allows us to load our stores with more product and facilitate the replacement cycle during the early part of our season.

[…] But again, the inventory that we're procuring today is for this season. And it's inventory that is being brought in earlier in preparation for season. It's not stocking up for kind of longer-term needs.

76.    Defendant Weddell also addressed analyst concerns about Trichlor inventory and inventory growth in Q1 2023:

We feel good about the inventory that we have in our facilities and in our stores. Again, when you think about that composition of product that we're bringing in early, it's high-turn product, top SKUs that we know we need for full season and where last year we talked a lot about kind of getting behind the curve and replenishment cycle.

[…] So I feel good with the position we have in inventory today.

77.    During the conference call, Defendant Egeck also addressed analysts' concerns about Leslie's Trichlor inventory levels. When asked about his thoughts on the risk of the Company's competitors sitting on too much Trichlor inventory, Defendant Egeck responded:

[I]n Trichlor [inventory], that's really us, and we control most of that supply chain now, particularly with our – particularly with our investment in stellar tableting.  So we feel good about where we are with Trichlor, but we've also bulked up the inventory there as well, with the idea that we're going to preposition a much higher percentage of it into the stores themselves.

78.    On February 3, 2023, the Company filed its Form 10-Q for the quarter ended December 31, 2022 with the SEC, which was signed by Defendant Weddell and included Sarbanes-Oxley Act certifications signed by Defendants Egeck and Weddell, reporting the Company's Q1 2023 results.  The Q1 2023 Form 10-Q stated: "There have been no material changes from the risk factors disclosed in our Annual Report on Form 10-K for the year ended October 1, 2022," filed on November 30, 2022.  The Company's FY 2022 Form 10-K contained the following purported risk disclosure that was incorporated by reference in the Company's Q1 2023 Form 10-Q, as well as the Company's Form 10-Q filed on May 5, 2023 (Q2 2023):

We may not be able to successfully manage our inventory to match consumer demand, which could have a material adverse effect on our business, financial condition, and results of operations.

We base our inventory purchases, in part, on our sales forecasts. If our sales forecasts overestimate consumer demand, we may experience higher

inventory levels, which could result in the need to sell products at lower than anticipated prices, leading to decreased profit margins. Conversely, if our sales forecasts underestimate consumer demand, we may have insufficient inventory to meet demand, leading to lost sales, either of which could materially adversely affect our financial performance.

**Q2 2023 Earnings Report**

79.    On May 3, 2023, the Company issued a press release containing the Company's financial results for the second quarter ended April 1, 2023. The press release reported that sales for the quarter decreased 6.7% and comparable sales decreased 13.5%, which Defendants attributed to "the impact of the normalization of the seasonal purchasing cycle to pre-pandemic patterns and adverse weather." Also, compared to the prior year, gross profit decreased 16.9%, and gross margins fell 410 basis points to 33.4% for the quarter, while adjusted EBITDA came in at a $8.4 million loss compared to a $8.7 million gain the prior year.

80.    The press release quoted Defendant Egeck stating that results were due to "the industry and Leslie's experienc[ing] comparable sales headwinds related to the normalization of the seasonal purchasing cycle to pre-pandemic patterns, as well as adverse weather in key markets," but that "[u]nderscoring these results was the strong execution of our diversified growth initiatives by our teams which helped to drive continued market share gains and position us well to deliver against our objectives as we head into the all important pool season."

81.    On May 3, 2023, the Company also held a conference call with analysts and investors, led by Defendants Egeck and Weddell, to discuss the Company's Q2 2023 results. During the conference call, Defendant Egeck assured investors that the Company's lower than expected Q2 results were a temporary issue:

> [W]e believe we are seeing a return to a more normalized pre-pandemic revenue contribution breakdown with 25% in the first half of the year and 75% in the second half. To be clear, we believe this change in seasonal consumer

purchasing behavior is a timing shift and not a reduction in underlying demand for the year.

82.    Defendant Weddell further assured the market about demand and that customers were just reverting back to seasonal buying patterns: "we believe consumers are more closely aligning their purchases with their need for product during the primary pool season, which runs from May to September," and "[i]t's important to note that we believe this behavior impacts the timing of sales, not the absolute dollars expected to be generated this year."

83.    During the conference call, Defendant Egeck also acknowledged, for the first time, that higher sales in Q2 2022 (prior year same quarter), had been driven by a letter Defendants sent to the Company's customers warning them of purported limited chemical supply and encouraging them to make purchases early and out of season:

> [W]e, at one point last year in the first quarter, actually sent a letter to our loyalty file, saying we couldn't guarantee product availability in the second half and encouraged them to purchase early prior to the pool season. And whether on their own or because of that letter, we saw a lot of that. And that was that 210 to 260 basis points increase in last year's Q2 in terms of the total year's contribution.

84.    However, as set forth below, Defendants failed to disclose that the real purpose of the letter was to rid the Company of excess inventory that had begun piling up at the end of 2021 as the Company's inventory of chemical products, specifically chlorine-based products, exceeded the volumes necessary to satisfy predicted demand.

85.    During the call, analysts again raised concerns about the Company's Trichlor inventory and asked Defendants Egeck and Weddell if they had a sense of whether customers were currently sitting on inventory:

> [**Jeffries LLC**:] Do you have a sense of how much safety stock your PRO customers have to run through before they need to purchase in greater quantities? And I guess, similar question for the homeowner, although I presume safety stock is less of a relevant concept here. But just trying to get a sense of kind of it sounds like this is going to be the peak for inventory and

you're going to kind of focus on working down that inventory and convert to cash flow. So just trying to get some sense around that dynamic.

\* \* \*

[**Defendant Weddell**:] We feel very good with where we're at going into season if you look at the year-on-year change in Q2, primarily around chemicals. [...] So at this point, going into season, heaviest use from a chemical perspective, we feel very good with our current inventory balances. The top 2 contributors, the inventory increase were still the chemical and equipment categories, which we've talked a lot about being nondiscretionary in nature. So we feel good with where we're at. And as you stated, I absolutely believe that we're at peak and we have an opportunity to materially decrease our inventory levels into year-end and beyond.

86.    Defendants' statements set forth above were materially false and/or misleading at the time they were made because they failed to disclose the following material adverse facts that were known to Defendants or recklessly disregarded by them about the Company's excess inventory of chlorine-based products and the excess inventory of these products that had been purchased and were held by Leslie's customers:

(a)    The Company's inventory of chlorine-based products exceeded the volumes necessary to satisfy predicted demand during the Relevant Period.

(b)    By the start of the Relevant Period, the Company's inventory of chlorine-based products had ballooned to the point that some of the Company's distributions centers had reached capacity and retail stores were being forced to take the excess inventory, turning them into makeshift warehouses. However, the retail stores did not have the physical space to store the excess inventory that was being sent to them, which created serious fire hazards due to the flammable nature of chlorine combined with lack of proper storage space. Many retail stores were storing the excess inventory outside of the stores, including in store parking lots, to manage these conditions.    Regional retail store managers were also personally moving inventory from one store to another because stores were overflowing with chlorine-

based products. Ultimately, in 2022 and into 2023, the Company had to retain third party chemical storage companies to store the excess inventory.

(c)    To manage this excess inventory, during the last quarter of 2021 and into 2022, retail store managers and employees were being directed to encourage customers to stock up on chlorine-based products to alleviate the excess inventory. Defendants also had the Company send letters to the Company's customers beginning in late 2021 "encouraging them to purchase [chlorine products] early prior to the pool season," which artificially inflated sales in 2022. However, these attempts to offload the excess inventory to customers undercut demand for the Company's chlorine-based products in 2023 as the Company's customers became oversaturated with chlorine-based products, which Defendants referred to as "garage and shed inventory."

(d)    The Company's inventory buildup drove down gross margin, as it was stuck with over-priced and over-transported inventory at a time when it was "unable to successfully maintain [the prior years'] higher pricing levels." In addition, the Company's logistics crisis led to "larger than expected inventory adjustments made after the completion of [Leslie's] annual physical inventory count" at the end of FY 2023, when the Company identified a material weakness related to controls over the performance of fiscal inventories.

## DISCLOSURE OF THE TRUTH

87.    On July 13, 2023, the Company issued a press release and filed a Form 8-K with the SEC, signed by Defendant Weddell, announcing preliminary Q3 2023 financial results (for the quarter ended July 1, 2023) and the departure of Defendant Weddell effective August 7, 2023. In the press release, the Company reported preliminary Q3 2023 earnings that were well below market expectations and announced that the Company was significantly cutting full year fiscal 2023 guidance by nearly 60%. The press release

explained that demand for the Company's chemical products in the quarter decreased because many of the Company's customers had larger than normal chemical inventories entering into the 2023 pool season.

88.    In the press release, Egeck stated:

> Our fiscal third quarter results were well below our expectations as low double digit traffic declines in our Residential and Pro businesses drove negative comps across both discretionary and non-discretionary categories. While abnormal weather continued to pressure traffic levels, customer surveys conducted towards the end of the quarter also indicated increased price sensitivity and that consumers entered the pool season with a greater than normal amount of chemicals leftover from last year.

89.    The press release also disclosed that lower demand in Q3 2023 resulted in an inability to pass through cost increases, which negatively impacted gross margins. The press release also stated that gross margins were impacted by higher inventory-related expenses, including higher distribution expenses. In the press release, Defendant Egeck stated:

> Our third quarter gross margins were down year-over-year due to higher product costs that we could not pass through to consumers, the impact of higher distribution-related expenses and capitalized costs as we reduce inventory from peak levels, and fixed cost deleverage. […] We also continue to aggressively manage our inventory balances. […]

90.    As a result of Defendants' disclosures, the price of the Company's stock dropped nearly 30%, from a closing price of $9.52 per share on July 13, 2023, to a closing price of $6.70 per share on July 14, 2023. The Company's stock price continued to fall another $1.24 per share the following trading day, or over 18%, closing at $5.46 per share on July 17, 2023.

91.    On August 2, 2023, the Company issued a press release reporting its financial results for the third quarter of 2023 ended July 1, 2023. The Company reported the same results given in its preliminary release and hosted an earnings conference call with investors to provide further color on the factors impacting its financial results. During the conference

call, Defendant Egeck explained "that a portion of our customers had a greater-than-normal amount of chemicals left over from last year . . . validated by 2 separate consumer surveys," stating that this "consumer behavior is not something we have seen before." Defendant Egeck added that "the lack of [loyalty] file growth, . . . has a lot to do with the 2 surveys that we ran, which showed a larger-than-normal amount of product left over in the industry in the consumers' hands. We've turned to calling it the garage and shed inventory internally."

92.     During the conference call, Defendant Egeck also stated that the costs associated with the Company's build-up of chemical inventory were the primary cause of gross margin erosion in the quarter: "[G]ross margins were impacted by 4 primary factors. First, incremental distribution expenses, including those related to capitalized distribution costs and investments in labor, offsite storage and transportation costs, lowered gross margin by 150 basis points." Later on the call, Defendant Egeck added: "Obviously, the inventory buildup and the associated costs with that, offsite storage, additional labor, increased transportation, those costs are in our margin, though those were flexed up given a rather extraordinary inventory levels we took to ensure supply."

93.     Defendant Egeck also informed the market that the Company experienced higher product costs in Q3 2023 and the Company had to lower chemical prices in the face of lower demand, which negatively impacted gross margins in the quarter. Defendant Egeck stated: "While we experienced higher product costs across categories, the largest impact was in our chemicals categories. We initially increased our selling prices for chemicals at the start of the season, but we were unable to successfully maintain those higher pricing levels."

94.     On the conference call, Defendant Egeck also acknowledged that the Company's retail stores had been providing feedback to Defendants about customers putting off chemical purchases because of stockpiled inventory. Defendant Egeck stated:

> We've got some feedback from our stores. They were hearing that from customers as they were coming in, particularly with regards to our water tests [AccuBlue]. Even in a down quarter, we ran more water tests than the prior

year's period, but the conversion of those tests was lower. And what we were hearing from the stores when we questioned it was that they were hearing that people had – already had those chemicals. So it's a highly unusual situation when we think of what the duration might be.

95.    On November 28, 2023, the Company issued a press release reporting its financial results for Q4 2023 and also hosted a conference call with investors to discuss the results.  In the press release, the Company reported that sales decreased 9.1% compared to the prior year same quarter and comparable sales decreased 11.0% compared to the prior year same quarter.  The Company also reported in the press release that gross profit decreased 26.3% compared to the prior year period due in part to inventory-related expenses, including a larger-than-expected adjustment that had to be taken after completion of the Company's year-end physical inventory count, and the expensing of capitalized distribution costs associated with the reduction of inventory.

96.    During the conference call, Defendant Egeck acknowledged that "customer stockpiling" of chlorine-based products was still plaguing demand for the Company products.  Also, both Defendant Egeck and the new CFO (Scott Bowman ("Bowman")) discussed the inventory adjustment that impacted gross margin in the quarter:

> [W]e incurred unexpected incremental inventory adjustment costs [that] resulted in a 260 basis point headwind in the quarter. This increase was mainly due to excess shrink and scrap [due to] higher levels of inventory and third-party storage locations, higher movement of goods between facilities and higher levels of [unsellable] returns.

97.    Bowman added that, in addition to the inventory adjustment, the Company identified a material weakness in internal controls over financial reporting related "to controls over the performance of physical inventories[].  As a result, we are designing and implementing new processes [and] enhanced controls to address the underlying causes of the material weakness in fiscal 2024."

98.     During the November 28, 2023 conference call, analysts asked about the Q4 2023 inventory adjustment, including:

> [**Morgan Stanley**:] [Y]ou said that the biggest gap in the guidance you gave was the inventory adjustments. Can you talk about why those were not observable in July?
>
> [**Bowman**:] […] The main reason is, as we kind of step back and look at the issue on inventory adjustments. The main issue, which is having too much inventory. We [peaked] close to $500 million, [then it] start[ed] to come down, but it's more inventory than we've had. In the past, I mean that required us to use several third-party off-site storage facilities with a lot of movement of product between those facilities. We had some higher and sellable return[s]. So, it just created a lot of movement of goods [and] goods not in our – inside our four walls. And so, that is the root of the problem . . . .

99.     On November 29, 2023, the Company filed its Form 10-K for the year ended September 30, 2023 ("FY 2023 Form 10-K") with the SEC, reporting the Company's FY 2023 results. The FY 2023 Form 10-K also discussed the inventory adjustment and associated material weakness:

> In connection with our year-end assessment of internal control over financial reporting as part of this Annual Report on Form 10-K, we determined that, as of September 30, 2023, we did not maintain effective internal control over financial reporting because of material weaknesses related to the design and/or operation of controls that were not performed at a sufficient level of precision with respect to (i) the performance of physical inventories and the validation of data utilized in inventory costing for a subset of our inventory. […]

100.    In the Management's Report on Internal Control over Financial Reporting section, the FY 2023 Form 10-K further stated:

> We identified a material weakness in the Company's internal control over financial reporting related to the operation of controls over the performance of a subset of the Company's physical inventories held at certain locations to validate inventory existence and the completeness and accuracy of data used in validating the appropriateness of inventory costing for a subset of the Company's inventories and inventory reserves.

101.    The FY 2023 Form 10-K also outlined Defendants' remediation efforts related to the Company's material weakness in internal controls over financial reporting with regard to inventory management, including: "[E]nhancement of the procedures over certain of our annual physical inventory counts, including the augmentation of training and validation of system generated reports utilized in performing certain annual physical counts and clear instruction as to the process for the recording of adjustments to inventory as a result of physical counts and validation of data used in inventory costing" and "examination and enhancement of the procedures over the completeness and accuracy of data utilized in computing inventory reserves."

## ALLEGATIONS OF CERTAIN DEFENDANTS' KNOWLEDGE
## AND ACCESS TO INFORMATION

102.    As the CEO and Director and Executive Vice President and CFO, respectively, Defendants Egeck and Weddell occupied 's highest executive positions and were responsible for, and remained well-informed of, issues critical to the Company's success.

103.    The fraud alleged herein involves one of the Company's core product offerings – chlorine-based chemicals.  Thus, a strong inference arises that Defendants were aware of, or recklessly disregarded, the true facts contradicting their false and misleading statements.

104.    Approximately 80% of the Company's product assortment is comprised of nondiscretionary products required for proper maintenance of pools and spas. Chemicals represent a large portion of this product mix, and its "core sanitizer" products include Trichlor, Cal Hypo, acid, and liquid bleach.

105.    Forty-five percent of the Company's sales are chemicals, and Trichlor alone contributes approximately 15% of total Company sales. Further, the Company and its officers were paying particular attention to the Trichlor contribution as it constituted an increasing percentage of the Company's year over year growth.  For example, Defendant

Egeck reported during Leslie's Q2 2022 earnings call that Trichlor sales had increased 96% in the quarter and, over a 2 year period, had increased 159%.

106. On quarterly earnings calls with analysts and investors, Defendants Egeck and Weddell frequently discussed and held themselves out as knowledgeable about the Company's inventory levels and, more specifically, the factors affecting supply of and demand for chlorine-based products, including Trichlor. Defendants provided updates on the market for Trichlor and Leslie's inventory levels on every earnings call – both in their prepared remarks and in response to analysts' questions.

107. For example, Defendant Egeck responded to analysts' questions regarding chlorine pricing dynamics in both Q1 and Q2 2022 with granular-level detail:

- "[W]hat will happen is the factory that was taken down by the hurricane will come back online. The volume that comes out of that plant will replace the domestic import volume that had come in to make up the gap. It should – it will be at a lower price than the imports. But I think most importantly, what the industry has seen is that the current prices on chlorine have not decreased demand at all. So we're not expecting any kind of reversion to pre-2020 pricing. There's a potential that we might see some reduction in prices, but I think the most likely scenario is a stabilized price environment for the industry on chlorine at these new higher levels." (February 3, 2022 conference call);

- "With regard to chlorine tabs, supply remains constrained and retail prices elevated. Over the last 2 years, our retail price for a 35-pound bucket tabs has increased from $99 to $199. We get a lot of questions about what happens if chlorine tab pricing reverses and we have price deflation. We do not believe that is likely in the near or medium term. And let me explain why. What consumers commonly referred to as chlorine tabs are actually Trichlor tabs. Trichlor is manufactured by combining chlorine, caustic soda and urea.

That combination creates Trichlor granules, which are then compacted into [a] tab. While domestic Trichlor capacity was impacted in 2020 and 2021 by the much discussed plant fire. The industry is also facing very tight chlorine supply conditions, which have created corresponding cost increases. Shortage in chlorine has 2 drivers. The first is structural. In the last 16 months, chlorine capacity in North [[America has been reduced by about 7%. The second factor is that chlorine is a key component of PVC. Chlorine used in PVC]] has a higher value than chlorine used and Trichlor manufacturing. The reduction in total chlorine capacity and the growth in PVC manufacturing has caused the amount of North American sourced chlorine available to U.S. Trichlor manufacturers to decrease by about 20%. The result is that domestic Trichlor capacity is tight and falling short of elevated consumer demand." (May 5, 2022 conference call); and

• "And as we've said in the past, some Trichlor imports could come down when additional Trichlor capacity comes up in the U.S. but the kind of newer information that we have is what I went through in the script that the chlorine input from North America is now a limiting factor and chlorine imports from China, which is the biggest exporter or Spain or tough economics. So what I would say is that the current pricing in the market reflects where people have become comfortable with margins at those higher imported prices. So I think when we look out to next year, supply will continue to be tight inputs will continue to be high. They could potentially go higher, but we certainly don't see them coming down. Yes. Dan, the one thing I'll add because we sometimes get this question as well, what if just more chlorine manufacturing capacity comes online globally. And from what we understand, it takes about 4 years and $1 billion to build a core alkaline plant. So I'm sure there's some in the

design phase, potentially domestic, but we don't know of any. But I would say probably overseas, but it takes time. There's no quick remedy to the supply side." (May 5, 2022 conference call).

108.   Defendant Weddell confirmed the executives' harmonious understanding during his prepared remarks on the Q2 2022 earnings call, reporting: "On inventory, we continue to expect inventory conditions in the industry to remain tight throughout fiscal 2022, particularly for chemicals and equipment."

109.   Defendants Egeck and Weddell also consistently reassured investors that the Company's business has "nondiscretionary recurring annuity-like demand because once a pool is built, it has to be maintained." As a result, the Company could be relied upon for providing "predictable growth."

110.   Not only did they evaluate industry conditions, but Defendants Egeck and Weddell repeatedly assured investors of their knowledge and management of the Company's inventory levels – including its strategy for front-loading inventory purchases.  In fact, the Company's inventory levels became such a significant metric for investors that analysts asked Defendants Egeck and Weddell for explanations about it on every earnings call.  For example, in Q1 2023, an analyst started off the question and answer session with a question about the Company inventory, observing that it "pops off the page."  In response, Defendant Weddell again confirmed his knowledge of the Company's inventory situation:

> Yes. It's a great question, Ryan. And as we think about our inventory growth, I mean there's 2 key reasons that inventory is up, one is sales growth over the last year – last few years. And then importantly, the strategic decision that we made to intentionally pull forward 2023 receipts in advance of season.
>
> We believe that pull forward is appropriate.  […] So the pull forward allows us to load our stores with more product and facilitate the replacement cycle during the early part of our season.

1
2

[…] But again, the inventory that we're procuring today is for this season. And it's inventory that is being brought in earlier in preparation for season. It's not stocking up for kind of longer-term needs.

3
4
5
6

111.    On the Q2 2022 earnings call, in response to an analyst's question about the Company's ability to secure Trichlor volumes in the midst of inflated prices, Defendant Egeck responded:

7
8

"We're in line to buy even more next year, need to feed the machine we've created for chemical consumption and the growing consumer profile."

9
10
11
12

112.    In response to analyst questions about how they should be thinking about inventory levels going forward, Defendant Weddell responded during the Q3 2022 earnings call:

13
14

And if the choice is to take inventory at a little bit higher level today, going into the end of the year and to start off next year in a better position versus try[ing] to run leaner[,] [w]e will take the former in the current environment.

15
16
17

So it's something we expect to actively manage in the year-end and through next year, don't necessarily view these levels as permanent increases. But in the current environment, it's the appropriate level of inventory.

18
19

He further clarified that he analyzed inventory at a granular level, stating: "[M]ost of the inventory growth is in Trichlor as well as equipment, but not all equipment, some equipment."

20
21

113.    Defendant Egeck confirmed on the same call that he also had confidence in inventory levels, stating: "Trichlor inventory is in good shape."

22
23

114.    During the Q1 2023 earnings call, in response to an analyst's question about the Company's bringing in "a lot" of inventory, Defendant Egeck responded:

24
25
26
27

[I]n Trichlor, that's really us, and we control most of that supply chain now, particularly with our – particularly with our investment in stellar tableting
So we feel good about where we are with Trichlor, but we've also bulked up the inventory there as well, with the idea that we're going to preposition a much higher percentage of it into the stores themselves.

28

115.    During the same call, when an analyst expressed concern about inventory growth, Weddell reassured investors:

> We feel good about the inventory that we have in our facilities and in our stores. Again, when you think about that composition of product that we're bringing in early, it's high-turn product, top SKUs that we know we need for full season and where last year we talked a lot about kind of getting behind the curve and replenishment cycle.

> He doubled down on his guarantee "[s]o I feel good with the position we have in inventory today."

116.    Defendants further demonstrated their continual knowledge and awareness of Leslie's inventory levels and associated consumer demand throughout the Relevant Period by renewing assurances that Leslie's would appropriately match inventory to consumer needs. For example, on each of the Q4 2022, Q1 2023, and Q2 2023 earnings calls, Weddell confirmed that he and Egeck monitored Leslie's inventory:

- "And most of the incremental inventory falls into the chemical and equipment categories that are not subject to technology or fashion risk. When we believe we have sufficient inventory to meet consumer demand through season and after we see supply chains across the industry become more predictable, then we will strategically manage inventory levels down to recoup some of the investments we have made in working capital over the last few years." (November 30, 2022 conference call);

- "[W]e continue to view our current elevated inventory position as appropriate and sensible given the uncertainty of supply. . . . When we believe we have sufficient inventory to meet consumer demand through season, and after we see supply chains across the industry become more predictable, then we will strategically manage inventory levels down." (February 2, 2023 conference call); and

- 38 -

• "We feel very good with where we're at going into season if you look at the year-on-year change in Q2, primarily around chemicals. . . . So at this point, going into season, heaviest use from a chemical perspective, we feel very good with our current inventory balances. The top 2 contributors, the inventory increase were still the chemical and equipment categories, which we've talked a lot about being nondiscretionary in nature. So we feel good with where we're at. And as you stated, I absolutely believe that we're at peak and we have an opportunity to materially decrease our inventory levels into year-end and beyond." (May 3, 2023 conference call).

117.    Egeck bolstered the reliability of Defendants' statements on calls and responses to analysts by detailing, prior to and during the Relevant Period, their personal monitoring of consumer behavior and the Company's ability to track demand:

• "We're constantly managing our supply chain, both for efficiency and quantity. So we're certainly not just sitting here not looking at it closely, but we feel very good of where we're at." (February 4, 2021 conference call); and

• "We also track new homeownership that has pools . . . we know where all the pools are, we know where all the new pools are being built, and we know when somebody moves from a home with a pool or moves into a home with a pool." (December 21, 2020 conference call).

118.    And, in the first question of the question-and-answer portion of the May 5, 2022 conference call for Q2 2022 earnings, a William Blair analyst specifically asked Egeck to "address the pull-forward question again, because from a high level, it looks like your COVID winner" and asked if Defendants had "tried to calculate a potential pullforward estimate or is this just not your view because of the macro drivers and share gain in price?" Egeck responded:

I would say it's not our view, both for the reasons you stated. And also, due to the fact that we track [sales] very carefully. We're able to see by consumer what they purchased prior years versus what they've purchased year-to-date. It's one of the things that we try to pay a lot of attention to. And we just haven't seen any indication of any meaningful pull-forward.

In his report, the analyst distilled his understanding of Defendants' knowledge from this exchange: "Management believes it is better prepared to deal with a consumer downturn than ever before given traction with initiatives and ability to react to data in the customer file."

119.    Egeck and Weddell admitted that "day-to-day" visibility into consumer demand provided them detailed insight into the level of inventory necessary to meet that demand, supporting a strong inference that they issued the false and misleading statements alleged above with scienter. Further, if Egeck and Weddell did not have detailed, up-to-date knowledge of consumer demand and inventory needs, then they acted recklessly in holding themselves out as knowledgeable about these issues and in discussing them in communications with investors.

**Board Materials Demonstrate the Director Defendants' Knowledge**

120.    ███████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████

121.    ███████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████

1  ████████████████████████████████████████████
2  ████████████████████████████████████████
3  122.  ██████████████████████████████████
4  ████████████████████████████████████████████
5  ████████████████████████████████████████████
6  ████████████████████████████████████████████
7  █████████████████████
8  123.  ██████████████████████████████████
9  ████████████████████████████████████████████
10 ████████████████████████████████████████████
11 ████████████████████████████████████████████
12 ████████████
13 124.  ██████████████████████████████████
14 ████████████████████████████████████████████
15 ████████████████████████████████████████████
16 ████████████████████████████████████████████
17 ████████████████████████████████████████████
18 ███████████████████████
19 125.  ██████████████████████████████████
20 ████████████████████████████████████████████
21 ████████████████████████████████████████████
22 ████████████████████████████████
23 126.  ██████████████████████████████████
24 ████████████████████████████████████████████
25 ████████████████████████████████████████████
26
27
28

127. ███████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
████████████████████

128. ███████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
████████████████████████████████

129. ███████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████

**Audit Committee Materials Support**

**the Director Defendants' Knowledge**

130. ████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
███████████████

131. ████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
██

132. ████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
██████████████

████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████



133.

134.

135.

136.

137. ████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████

138. ████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████

139. ████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
██████████████████

140. ████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████

1
2

3
4
5
6
7
8
9
10
11
12
13
14
15
16
17    141.
18
19
20
21    142.
22
23
24
25    143.
26
27
28

144.

145.

146.

147.



148.

149.

150.

1

## **DAMAGE TO THE COMPANY**

2

**Securities Class Action**

3      151.    On September 8, 2023, a securities class action complaint was filed in the

4   United States District Court for the District of Arizona against the Company and Defendants

5   Egeck and Weddell. The complaint alleges violations of Sections 10(b) and 20(a) of the

6   Securities Exchange Act of 1934 (the "Exchange Act"), and SEC Rule 10b-5, in the case

7   captioned: *Treasurer of the State of North Carolina v. Leslie's Inc., et al.*, Case No. 2:23-

8   cv-01887-SMB (D. Ariz.) (the "Securities Class Action").

9      152.    As a result of the wrongs complained of herein, the Individual Defendants

10   have subjected the Company to the significant cost of defending itself and certain of the

11   Company's officers.  The Company will continue to incur significant sums in relation to the

12   Securities Class Actions and any liability or settlement that results.

13   **Share Repurchases**

14      153.    According to the Company's SEC filings, on December 3, 2021, the Director

15   Defendants authorized a share repurchase program for up to an aggregate of $300 million of

16   the Company's outstanding shares of common stock over a period of three years, expiring

17   December 31, 2024.

18      154.    Pursuant to this share repurchase program, the Individual Defendants caused

19   the Company to repurchase its own common stock at artificially inflated prices, as follows:

20

21

22

| Month | Units | Share Price ($) | Total Cost ($) | Harm to the Company ($)[4] |
|-------|-------|-----------------|----------------|----------------------------|
| November 2022 | 27,329 | 15.32 | 418,680.28 | 269,463.94 |

23

24   ----

25   [4]      "Harm to the Company" refers to how much the Company overpaid for its own common stock by repurchasing it at artificially inflated prices and is calculated by subtracting what the Company should have paid for its stock (at $5.46 per share, as it was when the truth was revealed) from the "Total Cost," *i.e.*, what the Company actually paid for its common stock.

26

27

28

155.    The Individual Defendants, while in positions of control and influence and in possession of material non-public information, caused the Company to repurchase its own common stock at artificially inflated prices, which caused the Company to overpay for its own common stock by approximately $269,463.94.

**Unjust Compensation**

156.    At all relevant times, the Company paid lucrative compensation to each of the Individual Defendants. The Company paid the Individual Defendants in connection with their respective roles as officers and/or directors of the Company.

157.    Accordingly, as part of their respective roles, the Individual Defendants were required to, among other things, exercise due care and diligence in the management and administration of the affairs of the Company, act ethically and in compliance with all laws and regulations, maintain adequate internal controls, and conduct business in a fair and transparent manner.  Further, each of the Individual Defendants had additional duties and responsibilities owed to the Company by virtue of their executive, directorial and/or committee roles, as described *infra*, for which they were compensated for.

158.    However, the Individual Defendants failed to carry out their duties adequately or at all, causing harm to the Company, as alleged herein.  Because the Individual Defendants failed to carry out their respective duties, the compensation they received during the Relevant Period was excessive and undeserved.  As such, the Individual Defendants were unjustly enriched to the detriment of the Company.

**Additional Damage to the Company**

159.    In addition to the damages specified above, the Company will also suffer further losses in relation to any internal investigations and amounts paid to lawyers, accountants, and investigators in connection thereto.

160. The Company will also suffer losses in relation to the Individual Defendants' failure to maintain adequate internal controls, including the expense involved with implementing and maintaining improved internal controls.

161. The Company has also suffered, and will continue to suffer, a loss of reputation as a direct and proximate result of the Individual Defendants' misconduct which will plague the Company's share price going forward.

## CORPORATE GOVERNANCE

162. At all relevant times, the Company had in place extensive corporate governance documents imposing duties and responsibilities on its directors and officers, and additional duties on the Company's committee members. Accordingly, each of the Individual Defendants were required to comply with the corporate governance documents, as detailed below.

163. Despite the following corporate governance, the conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its investors that the Individual Defendants were aware posed a risk of serious injury to the Company.

**Code of Conduct**

164. The Board has adopted this Code of Ethics (the "Code") in order to deter wrongdoing and promote:

- honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships;

- full, fair, accurate, timely and understandable disclosure in reports and documents that the Company files with, or submits to, the Securities and Exchange Commission (the "SEC") and in other public communications made by the Company;

- compliance with applicable governmental laws, rules and regulations;

• the prompt internal reporting of violations of the Code to an appropriate person or persons identified in the Code; and

• accountability for adherence to the Code.

165.    The Code also sets forth the following:

**DISCLOSURE**

The Company's periodic reports and other documents filed with the SEC, including all financial statements and other financial information, must comply with applicable federal securities laws and SEC rules.

Each director, officer and employee who contributes in any way to the preparation or verification of the Company's financial statements and other financial information must ensure that the Company's books, records and accounts are accurately maintained. Each director, officer and employee must cooperate fully with the Company's accounting and internal audit departments, as well as the Company's independent public accountants and counsel.

Each director, officer and employee who is involved in the Company's disclosure process must:

> 1. be familiar with and comply with the Company's disclosure controls and procedures and its internal control over financial reporting; and

> 2. take all necessary steps to ensure that all filings with the SEC and all other public communications about the financial and business condition of the Company provide full, fair, accurate, timely and understandable disclosure.

Individuals should not disclose material nonpublic information about the Company to persons outside the Company unless they are specifically authorized to do so. The Company has designated spokespeople authorized to speak on behalf of the Company, and Company employees should refer any inquiries from the media, shareholders, investment advisers, financial analysts or others enumerated in the Company's Regulation FD Policy to the head representative of the Investor Relations department. External speaking or communications on the Company's behalf or done using the Company's name generally require prior approval.

**<u>Audit Committee Charter</u>**

166.    The Company maintains an Audit Committee Charter which sets forth the additional duties and responsibilities of the Audit Committee members. The Audit Committee Charter states that its purpose is to oversee the Company's accounting and financial reporting processes and the audits of the Company's financial statements:

> The Audit Committee's principal responsibility is one of oversight. Management of the Company is responsible for preparing the Company's financial statements, determining that they are complete, accurate, and in accordance with generally accepted accounting principles and establishing satisfactory disclosure controls and internal control over financial reporting. Th independent auditor is responsible for auditing the Company's financial statements and the effectiveness of the Company's internal control over financial reporting. The Company's internal and outside counsel are responsible for assuring compliance with laws and regulations and the Company's corporate governance policies.

167.    The Audit Committee shall have the following authority and responsibilities:

[] Internal Controls: To review with management, internal audit, and the Company's independent auditor the adequacy and effectiveness of the Company's internal control over financial reporting and disclosure controls and procedures, including any significant deficiencies, material weaknesses or other major issues in the design or operation of, and any material changes in, the Company's controls and any special audit steps adopted in light of any material control deficiencies, and any fraud involving management or other employees with a significant role in such internal controls, and review and discuss with management and the Company's independent auditor disclosure relating to the Company's controls, management's and the independent auditor's report on the effectiveness of the Company's internal control over financial reporting and the required management certifications to be included in or attached as exhibits to the Company's annual report on Form 10-K or quarterly report on Form 10-Q, as applicable.

***

[] Annual Financials: To review and discuss with the Company's independent auditor and management the Company's annual audited financial statements (including the related notes), the form of audit opinion to be issued by the independent auditor on the financial statements and the disclosure under "Management's Discussion and Analysis of Financial Condition and Results

of Operations" to be included in the Company's annual report on Form 10-K before the Form 10-K is filed. The Audit Committee shall recommend to the Board whether the audited financial statements should be included in the Company's annual report on Form 10-K.

[] Quarterly Financials: To review and discuss with the Company's independent auditor and management the Company's quarterly financial statements (including the related notes) and the disclosure under "Management's Discussion and Analysis of Financial Condition and Results of Operations" to be included in the Company's quarterly report on Form 10-Q before the Form 10-Q is filed.

[] Earnings Releases: To review and discuss with management and the Company's independent auditor: (1) the Company's earnings press releases, including the type of information to be included and its presentation and the use of any pro forma, adjusted or other non -GAAP financial information; and (2) any financial information and earnings guidance provided to analysts and ratings agencies, including the type of information to be disclosed and type of presentation to be made. Such discussions may be general (consisting of discussing the types of information to be disclosed and the types of presentations to be made), provided that each earnings release or each instance in which the Company provides earnings guidance need not be discussed in advance.

## DUTIES OF THE DIRECTOR DEFENDANTS

168.    As members of the Company's Board, the Director Defendants were held to the highest standards of honesty and integrity and charged with overseeing the Company's business practices and policies, and assuring the integrity of its financial and business records.

169.    The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its investors that the Director Defendants were aware posed a risk of serious injury to the Company

170.    By reason of their positions as officers and/or directors of the Company, and because of their ability to control the business and corporate affairs of the Company, the

Director Defendants owed the Company and its investors the fiduciary obligations of trust, loyalty, and good faith. The obligations required the Director Defendants to use their utmost abilities to control and manage the Company in an honest and lawful manner. The Director Defendants were and are required to act in furtherance of the best interests of the Company and its investors.

171. Each director of the Company owes to the Company and its investors the fiduciary duty to exercise loyalty, good faith, and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets. In addition, as officers and/or directors of a publicly held company, the Director Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, finances, and financial condition, as well as present and future business prospects, so that the market price of the Company's stock would be based on truthful and accurate information.

172. To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the affairs of the Company. By virtue of such duties, the officers and directors of the Company were required to, among other things:

        (a)      ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

        (b)      conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

        (c)      properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate

statements about the Company's business prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(d)    remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, take steps to correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws;

(e)    ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state and local laws, and rules and regulations; and

(f)    ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives.

173.    Each Director Defendant, by virtue of his position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Director Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

174.    The Director Defendants breached their duties of loyalty and good faith by causing the Company to issue false and misleading statements concerning the financial condition of the Company.  As a result, the Company has expended, and will continue to

1    expend, significant sums of money related to investigations and lawsuits and to structure

2    settlements to resolve them.

3                    **DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS**

4            175.    Plaintiff brings this action derivatively in the right and for the benefit of the

5    Company to redress injuries suffered and to be suffered as a direct and proximate result of

6    the Individual Defendants' breaches of fiduciary duties, gross mismanagement, and other

7    wrongful conduct as alleged herein.

8            176.    Plaintiff will adequately and fairly represent the interests of the Company and

9    its shareholders in enforcing and prosecuting its rights and has retained counsel competent

10   and experienced in derivative litigation.

11           177.    Plaintiff is a current owner of the Company's stock and has continuously been

12   an owner of Company's stock during all times relevant to the Director Defendants' wrongful

13   course of conduct alleged herein.   Plaintiff understands his obligation to hold stock

14   throughout the duration of this action and is prepared to do so.

15           178.    Because of the facts set forth herein, Plaintiff has not made a demand on the

16   Board to institute this action against the Individual Defendants.  Such a demand would be a

17   futile and useless act because the Board is incapable of making an independent and

18   disinterested decision to institute and vigorously prosecute this action.

19           179.    The Company's Board is currently comprised of eight (8) members including

20   Defendants Strain, Daniel, O'Farrell, Spofford, and non-parties Seth Estep ("Estep"), Lorna

21   E. Nagler ("Nagler"), Maile Naylor ("Naylor"), and Jason McDonnell ("McDonnell")

22   (collectively, the "Current Directors").  Thus, Plaintiff is required to show that a majority of

23   the Current Directors, *i.e.*, four (4), cannot exercise independent objective judgment about

24   whether to bring this action or whether to vigorously prosecute this action.

25           180.    Each of the Director Defendants face a likelihood of liability in this action

26   because they caused and/or permitted the Company to make false and misleading statements

27

28
                                                - 57 -

and omissions concerning the information described herein.  Because of their advisory, managerial, and directorial positions within the Company, the Director Defendants had knowledge of material, non-public information regarding the Company and were directly involved in the operations of the Company at the highest levels.

181.    The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

182.    The Director Defendants (or at the very least a majority of them) cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.  For the reasons that follow, and for reasons detailed elsewhere in this complaint, Plaintiff has not made (and should be excused from making) a pre-filing demand on the Board to initiate this action because making a demand would be a futile and useless act.

183.    Each of the Director Defendants, by virtue of their roles, were required to, among other things: (i) ensure that the Company complied with its legal and regulatory obligations and requirements; (ii) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time; (iii) remain informed as to how the Company conducted its operations, make reasonable inquiries, and take steps to correct any improper conditions or practices; and (iv) ensure the Company was operated in a diligent, honest, and prudent manner.  Despite this, the Director Defendants failed to fulfil these duties by permitting the false and misleading statements to be made and not correcting those statements.

184.    As trusted Company directors, the Director Defendants conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded their duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded their duties to protect corporate assets.

185.    Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

186.    Each of the Director Defendants reviewed, authorized, signed, and thus personally made and/or otherwise permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

187.    Additionally, each of the Director Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

188.    ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

189.    Despite having knowledge of the history of the misconduct and mismanagement alleged herein, the Current Directors have failed to seek recovery for Leslie's for any of the misconduct alleged herein.

### THE DIRECTOR DEFENDANTS ARE
### NOT INDEPENDENT OR DISINTERESTED

**Non-Party McDonnell**

190.    Non-Party McDonnell is neither disinterested nor independent and is thus

incapable of considering a demand to sue because he (as its CEO) is an employee of the Company who derives substantially all of his income from his employment with the Company, making him not independent.  As such, Non-Party McDonnell cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would expose him to liability and threaten his livelihood.

191.  As CEO, Non-Party McDonnell also fails the NASDAQ bright-line independence test as set forth in NASDAQ Listing Rule 5605(a)(2) and cannot, therefore, be considered independent. As such, Non-Party McDonnell could not objectively and disinterestedly consider a demand to sue the Individual Defendants and any demand upon Non-Party McDonnell is therefore futile.

192.  In addition, Non-Party McDonnell receives lucrative compensation in connection with his employment with the Company. Non-Party McDonnell is not independent from Defendant Spofford and non-parties Estep, Naylor, and Nagler as they comprise the Compensation Committee and are responsible for evaluating and determining the compensation of the Executive Officers, including Non-Party McDonnell. The purpose of the Compensation Committee is to assist the Board in discharging its responsibilities related to the compensation provided by the Company to its CEO and Executive Officers. Because of his status as an inside director, and the concomitant substantial compensation he receives, Non-Party McDonnell could not consider a demand adverse to the Director Defendant serving on the Compensation Committee who is responsible for his financial future.

**Defendants Strain, O'Farrell, Daniel, and Spofford**

193.  Defendants Strain, O'Farrell, Daniel, and Spofford have served as Company directors at all relevant times hereto. As directors, Defendants Strain, O'Farrell, Daniel, and Spofford were required to, among other things: (i) ensure that the Company complied with its legal and regulatory obligations and requirements; (ii) properly and accurately guide

investors and analysts as to the true financial condition of the Company at any given time; (iii) remain informed as to how the Company conducted its operations, make reasonable inquiries, and take steps to correct any improper conditions or practices; and (iv) ensure the Company was operated in a diligent, honest, and prudent manner. Despite this, Defendants Strain, O'Farrell, Daniel, and Spofford failed to fulfil these duties by permitting the false and misleading statements to be made and not correcting those statements.

194. As trusted Company directors, Defendants Strain, O'Farrell, Daniel, and Spofford conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded their duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded their duties to protect corporate assets.

195. Defendants Strain, O'Farrell, Daniel, and Spofford are also all members of the Audit Committee and had certain additional duties by virtue thereof, as described *supra*. Among the responsibilities, Defendants Strain, O'Farrell, Daniel, and Spofford were required to oversee the Company's compliance with all laws and regulations. However, Defendants Strain, O'Farrell, Daniel, and Spofford failed to fulfil these duties and permitted and/or caused the Company to issue false and/or misleading statements in violation of state and federal law and SEC rules. Defendants Strain, O'Farrell, Daniel, and Spofford further breached their fiduciary duties by failing to ensure that adequate internal controls were in place regarding the serious issues and deficiencies described above.

196. Defendants Strain, O'Farrell, Daniel, and Spofford also personally reviewed, approved, and signed the false and misleading periodic reports filed with the SEC, and further failed to correct the false and misleading statements alleged herein. For these reasons, Defendants Strain, O'Farrell, Daniel, and Spofford breached their fiduciary duties, face a substantial likelihood of liability and are neither independent nor disinterested, and thus demand upon them is futile and, therefore, excused.

**Defendants O'Farrell and Daniel**

197.    During the Relevant Period, Defendants O'Farrell and Daniel served as members of the Audit Committee.  Pursuant to the Company's Audit Committee Charter, the members of the Audit Committee are responsible for, *inter alia*, overseeing the accounting and financial reporting processes of the Company and the audits of the financial statements of the Company, and otherwise meet their responsibilities as set forth in the Audit Committee Charter as set forth herein

198.    Defendants O'Farrell and Daniel breached their fiduciary duties of due care, loyalty, and good faith, because the Audit Committee, *inter alia*, allowed or permitted false and misleading statements to be disseminated in the Company's SEC filings and other disclosures and, otherwise, failed to ensure that adequate internal controls were in place regarding the serious accounting and business reporting issues and deficiencies described above. Therefore, Defendants O'Farrell and Daniel face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile.

199.    ████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████

**Defendant Strain**

200.    In addition to the foregoing, according to his Board Questionnaire, ███

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████

**Additional Reasons Demand is Futile**

201.    The Director Defendants authorized the harmful share repurchase program which the Individual Defendants took advantage of during the Relevant Period, causing over $269,000 worth of damage to the Company which has been unremedied. The Director Defendants each face a likelihood of liability as a result of these harmful share repurchases and cannot, therefore, consider a demand to sue.

202.    The Company has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Current Directors have not caused the Company to take action to recover for the Company the damages it has suffered and will continue to suffer thereby.

203.    The Company, at all material times, had its Code of Conduct and related corporate governance policies which required each of the Individual Defendants to maintain the highest standards of honesty and integrity, particularly in relation to accurate and truthful public disclosures. Yet, despite this Code of Conduct and other relevant policies and committee charters, each of the Director Defendants failed to ensure that the Company upheld high standards of integrity, misrepresented facts to the investing public, and failed to report any concerns, or investigate any misconduct, let alone commence litigation against the Individual Defendants.

204.    In violation of the Code of Conduct, the Director Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to cause the Company to issue materially false and misleading statements to the public and to

facilitate and disguise the Defendants' violations of law, including breaches of fiduciary duty, waste of corporate assets, and unjust enrichment. In violation of the Code of Conduct, the Director Defendants failed to comply with laws and regulations, failed to maintain the accuracy of company records, public reports, and communications, and failed to uphold the responsibilities related thereto. Thus, the Director Defendants face a substantial likelihood of liability and demand is futile as to them.

205.    The Current Directors received, and continue to receive, substantial salaries, bonuses, payments, benefits, and other emoluments by virtue of their membership on the Board.  They have benefitted from the wrongs alleged herein and have engaged therein to preserve their positions of control and the prerequisites thereof and are incapable of exercising independent objective judgment in deciding whether to bring this action.

206.    The Director Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

207.    Publicly traded companies, such as Leslie's, typically carry director and officer liability insurance from which the Company could potentially recover some or all of its losses.  However, such insurance typically contains an "insured vs. insured" disclaimer that will foreclose a recovery from the insurers if the Individual Defendants sue each other to recover the Company's damages. If no such insurance is carried, then the Current Directors will not cause the Company to sue the Individual Defendants named herein, since,

if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event.

208. Accordingly, each of the Current Directors, and at least a majority of them, cannot reasonably consider a demand with the requisite disinterestedness and independence. Indeed, any demand upon the Current Directors is futile and, thus, excused.

## CLAIMS FOR RELIEF

## FIRST CAUSE OF ACTION

### (Against the Individual Defendants for Breach of Fiduciary Duties)

209. Plaintiff incorporates by reference and re-allege each and every allegation contained above, as though fully set forth herein.

210. The Individual Defendants owe the Company fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

211. The Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

212. The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by failing to disclose to investors: (i) that the company lacked adequate internal controls over financial reporting; (ii) that there was a substantial likelihood the Company failed to accurately disclose all executive officers, members of management, and potential related party transactions in fiscal years 2020 through 2023; (iii) that there was a substantial likelihood the Company failed to properly characterize certain fees paid for investor relations and legal services as reductions of proceeds from capital raises rather than period expenses in fiscal years 2021 and 2022; (iv) there was a substantial likelihood the Company failed to appropriately value unrestricted stock awards to officers, directors, employees and others in fiscal years 2020 through 2022;

and (v) that, as a result of the foregoing, the Individual Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

213. As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, the Company has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

214. As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs associated with defending securities lawsuits, severe damage to the share price of the Company, resulting in an increased cost of capital, the waste of corporate assets, and reputational harm.

## SECOND CAUSE OF ACTION

### (Against the Individual Defendants for Gross Mismanagement)

215. Plaintiff incorporates by reference and re-allege each allegation contained above, as though fully set forth herein.

216. By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of the Company in a manner consistent with the operations of a publicly held corporation.

217. As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, the Company has sustained significant damages in excess of hundreds of millions of dollars.

218. Because of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

. . . .

**THIRD CAUSE OF ACTION**

**(Against the Individual Defendants for Waste of Corporate Assets)**

219.  Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

220.  The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the Relevant Period.  It resulted in continuous, connected, and ongoing harm to the Company.

221.  As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, *inter alia*: (i) paying excessive compensation and bonuses to certain of its executive officers; (ii) awarding self-interested stock options to certain officers and directors; (iii) incurring potentially millions of dollars of legal liability and/or legal costs to defend the Officer Defendants' unlawful actions; and (iv) causing the Company to repurchase its own common stock at artificially inflated prices.

222.  As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

**FOURTH CAUSE OF ACTION**

**(Against the Individual Defendants for Unjust Enrichment)**

223.  Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

224.  By their wrongful acts, violations of law, and inaccurate and untruthful information and/or omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and the detriment of, the Company

225.  The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from the Company that

1  was tied to the performance of the Company or its stock price or received compensation or

2  other payments that were unjust in light of the Individual Defendants' bad faith conduct.

3    226.    Plaintiff, as a shareholder and representative of the Company seeks restitution

4  from Defendants and seek an order from this Court disgorging all profits, including from

5  insider transactions, the redemption of preferred stock, benefits, and other compensation,

6  including any performance-based or valuation-based compensation, obtained by the

7  Individual Defendants due to their wrongful conduct and breach of their fiduciary and

8  contractual duties.

9    **FIFTH CAUSE OF ACTION**

10    **(Against the Individual Defendants for Aiding and Abetting)**

11    227.    Plaintiff incorporates by reference and realleges each and every allegation set

12  forth above, as though fully set forth herein.

13    228.    The Director Defendants exploited, aided and abetted, and were knowing and

14  culpable participants to the breaches of fiduciary duty by the Officer Defendants. Likewise,

15  the Officer Defendants exploited, aided and abetted, and were knowing and culpable

16  participants to the breaches of fiduciary duty by the Director Defendants.

17    229.    Specifically, the Director Defendants, in violation of the Company's corporate

18  governance, engaged in and/or permitted the Company to engage in the scheme to issue

19  materially false and misleading statements to the public, including in the Company's SEC

20  filings, and by facilitating and disguising the Officer Defendants' violations of law as alleged

21  herein, and failing to report the same.

22    230.    The Officer Defendants, in violation of the Company's corporate governance,

23  engaged in and/or permitted the Officer Defendants' lack of oversight and scheme to issue

24  materially false and misleading statements to the Company's shareholders to secure, *inter*

25  *alia*, the re-election of certain Director Defendants, by facilitating and disguising the

26  Director Defendants' violations of law as alleged herein, and failing to report the same.

27

28

231.   As a result, the Director Defendants substantially assisted the Officer Defendants, and the Officer Defendants substantially assisted the Director Defendants in breaching their fiduciary duties and in committing the other wrongful and unlawful conduct as alleged herein.

232.   As a direct and proximate result of the aiding and abetting the breaches of fiduciary duty alleged herein, the Company has sustained and will continue to sustain significant damages.

233.   As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

## SIXTH CAUSE OF ACTION

**(Against the Individual Defendants for Violations of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 Promulgated Thereunder)**

234.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

235.   During the Relevant Period, the Individual Defendants disseminated and/or approved public statements that failed to disclose that the above-referenced truthful facts and as a result of the foregoing, the Individual Defendants' public statements were materially false and misleading at all relevant times.  Thus, the price of the Company's shares was artificially inflated due to the deception of the Individual Defendants.  Despite this artificial inflation in the price of the Company's shares, the Individual Defendants caused and/or allowed the Company to repurchase many millions of shares of Company stock, thereby causing significant financial harm to the Company.

236.   As alleged herein, the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially

participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Leslie's, their control over, and/or receipt and/or modification of Leslie's' allegedly materially misleading statements and/or their associations with the Company which made them privy to confidential proprietary information concerning Leslie's, participated in the fraudulent scheme alleged herein.

237.    The Individual Defendants knew and/or recklessly disregarded the false and misleading nature of the information which they caused to be disseminated to the investing public. The fraudulent scheme described herein could not have been perpetrated during the Relevant Period without the knowledge and complicity or, at least, the reckless disregard of the personnel at the highest levels of the Company, including the Individual Defendants.

238.    The Individual Defendants were each members of Leslie's' Board of Directors and senior management team during the aforesaid time period.  Based on their roles at Leslie's, each of the Individual Defendants would have been involved with, or knowledgeable about, the wrongdoing alleged herein.

239.    At a minimum, the Individual Defendants failed to review or check information that they had a duty to monitor or ignored obvious signs that their statements were materially false and misleading or contained material omissions.  Given the nature and extent of the problems at Leslie's, the Individual Defendants knew and/or recklessly disregarded the extent and scope of their statements during the Relevant Period.

240.    Likewise, the Individual Defendants, by virtue of their high-level positions with the Company, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels and were privy to confidential proprietary information concerning the Company and its business, operations, financial statements, and financial condition, as alleged herein.  The Individual

Defendants had the ultimate authority over and were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements regarding the Company were being issued, and approved or ratified these statements, in violation of the federal securities laws.

241.   As such the Individual Defendants caused the Company to violate section 10(b) of the Exchange Act and SEC Rule 10b-5 in that they: (i) employed devices, schemes, and artifices to defraud; and (ii)  made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

242.   As a result of the wrongful conduct as alleged herein, the Individual Defendants have violated Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5 promulgated thereunder and are thus liable for any harm caused to the Company.

## **REQUEST FOR RELIEF**

**WHEREFORE**, Plaintiff demands judgment as follows:

A.      Determining that this action is a proper derivative action maintainable under law, and that demand is excused;

B.      Awarding, against all the Individual Defendants and in favor of the Company, the damages sustained by the Company as a result of the Individual Defendants' breaches of their fiduciary duties, gross mismanagement, unjust enrichment, waste of corporate assets, aiding and abetting, and violations of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder;

C.      Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures, to comply with the Company's existing governance obligations and all applicable laws and to protect the Company and its investors from a recurrence of the damaging events described herein;

1    D.    Awarding to Plaintiff the costs and disbursements of the action, including

2    reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

3    E.    Granting such other and further relief as the Court deems just and proper.

4    **JURY DEMAND**

5    Plaintiff demands a trial by jury on all issues so triable.

6    Dated: December 17, 2024

7    **RUSING LOPEZ & LIZARDI, P.L.L.C.**

8

9    By: */s/ Mark D. Lammers*
10    Mark D. Lammers
     6363 North Swan Road, Suite 151
11    Tucson, AZ 85718
     Telephone: (520) 792-4800
12    Facsimile: (520) 529-4262
     Email: mdlammers@rllaz.com
13

14    **GAINEY McKENNA & EGLESTON**
     Thomas J. McKenna
15    Gregory M. Egleston
     260 Madison Ave., 22nd Floor
16    New York, NY 10016
     Tel: (212) 983-1300
17    Fax: (212) 983-0383
     Email: tjmckenna@gme-law.com
18    Email: gegleston@gme-law.com

19
     ***Attorneys for Plaintiff***
20

21

22

23

24

25

26

27

28

## VERIFICATION

I, IAN MEDNICK, declare that I have reviewed the Verified Shareholder Derivative Complaint ("Complaint") prepared on behalf of Leslie's, Inc. and authorize its filing. I have reviewed the allegations made in the Complaint, and to those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do no have personal knowledge, I rely on my counsel and their investigation and for that reason believe them to be true. I further declare that I am a current holder, and have been a holder, of Leslie's, Inc. common stock at all relevant times.

*Ian Mednick*

IAN MEDNICK

1